Good morning, Your Honors. May it please the Court. My name is Hank Branham. I'm an Assistant Federal Defender for the District of Montana. I'd like to reserve two minutes for rebuttal. And I'm here on behalf of Bill Watson. Our first issue in this case is essentially, as I see it, about the tension between a district court's scheduling order and practices versus the government's interpretation of Brady and Jenks. In this case, the district court set a discovery deadline of June 8th of last year. The trial was set for July 25th. On July 19th, the government produced to the defense a report from their FBI examiner and the FBI lab. Now, if this report came in late, not due to any fault in the prosecutor's office, and they didn't reveal it because it was late, you'd be really on them for failure to do a Brady disclosure, would you not? Yes. So this is a very odd case. So they come forward with that, but they have some exculpatory evidence from their side that really this report didn't reflect any of this victim's clothing. So what do we do with that? Did you ask for a continuance? No, I did not. I asked that it be excluded, and I asked to subpoena the ER nurse, which the judge allowed. And at the time, it seemed to be credulity, but he allowed it. And we got to call her the next morning after Mr. Watson had testified. But this first report from the FBI comes, and then the tribal investigator goes out to find out, well, how can this be? And we get that report of the two new statements concerning the underwear the morning of trial. And the prosecutor told the court she'd had them for a few days. And that's troubling, that why didn't we get them right away? You know, we get hit with them when we're about to start evidence. But you didn't ask for a continuance right then? That's correct. I think I would have known, I know what the ruling would have been and took the position that discretion was the better part of valor at that point. But you're right. There is no, we can't speak in hypotheticals. But wouldn't you have at least been in a better position to come to this court saying, I was prejudiced, there were some things I could have done, and I asked for additional time, and I didn't get it? Yes. That's clear. I mean, I agree. But I think you didn't ask to have the report excluded. Well, the report never came in. It was the testimony that was in the report. That's what I asked to have excluded. But they couldn't, at the last minute, all of a sudden, they have an explanation. So, you know, we get told a week before trial, there's no DNA evidence. No, we want to go to trial. I mean, my client had been locked up already. He didn't want any more delays. And then we get hit, I keep saying morning, yeah, it may have actually been at noon. But anyway, when we're getting ready to start the trial, with, hey, here's our explanation now as to why, because she apparently wore her mother's underwear, according to, I believe it was Nicole Mariani that testified to that. So we were lulled into a false expectation and then blindsided at the last minute. And it's our argument to this court that it wasn't abuse of discretion, and it resulted in a fundamentally unfair trial to Mr. Watson. Our second point is that the evidence was insufficient to support a conviction. According to the testimony, you have a 19-year-old man, and this is a delicate topic, but he's fully aroused, he's engaged in sexual intercourse, gets pulled away, has time to get his pants up, and there's no forensic evidence. I would submit that's very contrary to common sense and what you would think would be there. There was nothing. Nothing was found. Because we have the testimony of the brother as to what he found and what he saw. Yes, we did. And that's And we don't have any evidence that he was trying to retaliate against Watson or that he had a grudge against him or anything of that sort. No, we have his, J.C., the brother's testimony, and he says that Mr. Watson keeps apologizing. Well, none of the other witnesses who came into this scuffle heard that. And I would point the court to the dissent by Judge Reinhart in Guam v. McGrady, where he talks about how these type of sexual abuse cases are the worst, the toughest, the hardest. The two guys, in fact, the grudge, they were acquaintances and were on friendly terms, the brother and Mr. Watson. I mean, there was no, at least that we developed or knew about, no real animus between the two kids. And the jury believed the brother? Apparently so, yes. So it's hard to say that there wasn't evidence that could support a conviction. Well, if I just said evidence, I mean, no scientific evidence, no forensic, no DNA, no nothing like that. Yes, there was the testimony of one person against another. That's what it came down to, apparently. And you had the ability to argue that there was no forensic evidence, did you not? And I did, at length. Yes, Your Honor. No, I was not prohibited. We were not, the defense was not prohibited from arguing that, in my recollection from my closing, as I argued it at great length. The last issue is the sentence. As we all know, the standard for sentencing is unclear at the moment. Mr. Watson had very little, and I think he had no scorable criminal history. We had letters of support from 50 family members and friends, which in a small community like the Rocky Boy Reservation, I believe is significant. It sounds like there's been a considerable amount of kind of harassment by Watson's family and a lot of... Well, we would disagree with that characterization, Your Honor. I think it's their youngest son, and they're quite emotionally wound up, and they believe he was falsely convicted. But there were a number of letters of... Well, by my count, it was around 50 in support of him, and I don't think that the sentence or the district court in sentencing Mr. Watson didn't accurately take that into account, or sufficiently, I suppose would be a more accurate way of stating it. And so for those reasons, no, we would ask the conviction be reversed or the alternative remanded for resentencing. All right. Thank you. Good morning, Your Honors. Eric Wolf, District of Montana, U.S. Attorney's Office. Starting with the purported discovery violation, it really is a case of no good deed goes unpunished. The federal prosecutor here did not violate Rule 16. You know, I've heard that before. Well, it is true in this case. I can't speak for any other cases. But what happens here, the United States is not waiting for the DNA test to come back to determine whether we believe a rape occurred. We have eyewitness testimony from the brother. The next morning, they take her into the hospital. They report it to the police. That's why he's charged with rape. The DNA is sent off. And then, granted, it's close to the time of trial. It comes back, and it doesn't match up. They've got some semen that they can't figure out who it's from. And they have DNA that is from a family member, which is very strange. And the assistant U.S. attorney in this case just, bang, gives it to defense counsel because she has to. That's Brady. But then the FBI expert talks with her about it and says, you know, this is really odd that we have DNA in here. It's not from the victim. But because it's DNA, they can tell it's from somebody who's related. Why don't you go see if she changed her clothes? So that's what they did. They went out and interviewed the victim. And the young lady who helped her change her clothes that night. And sure enough, she put on her mother's underwear. And there was a couple-day delay. And if anyone had asked the prosecutor at trial why there was that delay, it's because over the weekend she confirmed, without giving those statements to the two witnesses, she confirmed herself that that's, in fact, what happened. And then the day of trial, under no obligation by Rule 16 or the Jenks Act, she hands it over. There's no ambush or anything. And then what does she get for that? Well, she gets an allegation of prosecutorial misconduct in the Ninth Circuit. There is no basis under Rule 16 or the Jenks Act or Brady or Giglio or anything else that she committed misconduct. The only allegation is, well, I had what I thought was exculpatory evidence, and I really didn't like it when you explained it away. I would prefer that that explanation had been excluded. As we say in the brief, that is a perversion of the truth-seeking process. And there's no basis for overturning this conviction because of any of that conduct. On the sufficiency of the evidence, he had eyewitness testimony from the brother. The jury clearly believed it. The actions of the victim and the brother and the victim's friend, Nicole, were all consistent with them concluding that she had been raped by Mr. Watson. And that's what the jury believed. To compare this case to what Judge Reinhart said in his dissent in the Guam case is absurd. That case involved a single testimony of a child who was allegedly molested at the age of 7 or 9. And Judge Reinhart was simply pointing out that when we have a total denial by an adult and a very young child as the sole witness, that is a very troubling situation. Well, that is not even close to this case. So the sufficiency argument is – has no basis at all. As for the sentence, there – while he does have a criminal history category of 1, there was very – there was some history there that was disturbing. He received a mid-guideline sentence. Paragraph 8 of the PSR has the letter from the victim's mother. Not quite a mid-guideline sentence, 178 for the range of 151 to 184. I mean, you received close to the top of the range. Granted. A high middle. Is that a fair depiction? It wasn't the top, but it was certainly not exactly in the middle. I would – I would point out that there is a very – at paragraph 8 of the PSR. And I point that out to circle back to the policies behind the Jenks Act and Rule 16, because when you turn over statements by victims and other witnesses pretrial, you are frequently running the risk that they will be approached by either the defendant or people who are sympathetic to the defendant, and it will cause them problems. And the problems may not rise to the level of obstruction of justice, but in a very small town, it can frequently lead to ostracization and embarrassment. And that's what the victim's mother was reporting to the court. And that's why we have those policies, and that's why in certain types of cases the government is perfectly entitled to decide that it will not turn these things over, because it doesn't have to, because it is serving policies such as that. In this case, the prosecutor erred on the side of helping the defense, and she was accused of misconduct for it. Tell me, what did the other 49 letters from various people report about this? Well, they – they obviously suggested that he's a good guy and he's a – he rides on rodeos and he helps out and whatnot, and, you know, that's – I've prosecuted some persons that I thought were all around good guys, but they also happened to break the law, so it's not terribly uncommon. The court obviously thought that the circumstances of the case, the fact that he still denied it, and his record warranted a guideline sentence and that it was reasonable. All right. Thank you. This matter is submitted. Oh, I'm sorry. Go ahead. Your Honor, a couple things I disagree with. Well, first of all, nowhere in our brief, nowhere in anything I've said here, nothing I said in front of Judge Haddon did I say prosecutorial misconduct on Ms. Peckham's behalf, because I don't think that's what it is. It may be not as quick as I like. I think the judge should have given us the relief we requested, but I'm not accusing her of anything that serious, and I want to make sure that's clear. However, I do disagree with the characterization that just bang, we got the report. The argument was, well, over the weekend she talked to the witnesses. Okay. Trial started on a Wednesday. What happened on Monday and Tuesday that we don't get these new statements? And then also Judge Haddon's discussion to both counsel after the jury left that it's the practice of his court, which is prompt and immediate disclosure of all matters and not withhold anything until the last minute. So, again, I think it's the tense, what I struggled with, and I submit the issue is the struggle between the court's practice and, yes, what is set on in the statute, and what we've come to expect, and then the government, well, but the statute says this. Okay, yes, it's very well made, but we're all used to the local practice, and that's how we got, in my opinion, caught at the last minute with this report. I think the letters of support were significant. Certainly, he's not a juvenile, but a very young man. This is a very long time to go away and be removed from his family and in support of the community. So, again, our request is that you reverse the conviction or, in the alternative, at least remand for his sentencing. All right. Thank you.
judges: B. Fletcher, Pregerson, Selna